# In The
# United States Court Of Appeals
# For The Federal Circuit

## RYAN E. ALLEY,
## dba Ryan Alley Intellectual Property Law,

*Appellant,*

v.

## INNOVATION LAW GROUP, LTD.,

*Appellee.*

APPEAL FROM THE
PATENT AND TRADEMARK OFFICE - PATENT TRIAL AND APPEAL BOARD IN
OPPOSITION NO. 91202418

———————————

## BRIEF OF APPELLEE

———————————

**Jacques M. Dulin, Esq,**
**INNOVATION LAW GROUP, LTD.**
**237 N. Sequim Ave.**
**Sequim, WA 98382**
**(360) 681-7305 (Telephone)**
**(360) 681-7315 (Facsimile)**
**dulin@innovationlaw.com**

*Counsel for Appellee*

FORM 9.  Certificate of Interest

Form 9

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Ryan E. Alley, etc.          v.    Innovation Law Group, Ltd.

Case No.     15-1976

### CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)

Appellee                                certifies the following (use "None" if applicable; use extra sheets if necessary):

1.      The full name of every party or amicus represented by me is:

Innovation Law Group, Ltd.

2.      The name of the real party in interest (Please only include any real party in interest NOT identified in Question 3. below) represented by me is:

Jacques M. Dulin, Esq.

3.      All parent corporations and any publicly held companies that own 10 percent of the stock of the party or amicus curiae represented by me are listed below. (Please list each party or amicus curiae represented with the parent or publicly held company that owns 10 percent or more so they are distinguished separately.)

None

4. ☒    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court (and who have not or will not enter an appearance in this case) are:

TechMark; Neil D. Greenstein, Counsel for Appelee/Opposer before the TTAB

September 15, 2015                              /s/ Jacques M. Dulin, Esq.

          Date                                      Signature of counsel

Please Note: All questions must be answered

                                                Jacques M. Dulin, Esq.

cc:    Neil D. Greenstein, Esq.                      Printed name of counsel

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ................................................................................i

TABLE OF CONTENTS.................................................................................... ii

TABLE OF AUTHORITIES ..............................................................................iv

STATEMENT OF RELATED CASES ...............................................................ix

I.    JURISDICTIONAL STATEMENT ............................................................1

II.   STATEMENT OF THE ISSUE...................................................................1

III.  STATEMENT OF THE CASE ....................................................................2

      A.    TTAB Decision Appealed-from by Appellant/Applicant Alley ...........2

      B.    Appellant/Applicant's Application .....................................................2

      C.    Institution of Opposition Following Notice to Appellant Alley ...........2

      D.    Opposition Proceedings and Evidence Adduced .................................3

      E.    The TTAB Decision and Opinion ........................................................5

      F.    Findings by the Board ........................................................................6

IV.   STATEMENT OF FACTS ...........................................................................7

      A.    Opportunity for Actual Confusion to Have Occurred...........................7

      B.    Degree of Sophistication of Clients ...................................................12

      C.    Informing a Client Is a Duty, Whether Sophisticated or Not..............15

      D.    Function of Both Marks in Marketing Legal Services: Contact
           Motivation .......................................................................................16

E.      Policing Efforts by Appellee/Opposer/ILG of its Incontestable
        Marks .............................................................................................. 18

VI.     SUMMARY OF THE ARGUMENT ............................................. 28

VII.    ARGUMENT ..................................................................................... 31

A.      Standard of Review ....................................................................... 3

B.      The Board Properly Considered the Marks in their Entirety – It
        is Appellant Who Improperly Dissects the Marks ............................ 34

C.      Appellant Conflates Consumer Sophistication with the Function
        of the Marks – Likelihood of Initial Interest Confusion .................... 42

D.      There Was Substantial Evidence for the Board to Find
        Insufficient Opportunity for Confusion to Occur .............................. 47

E.      Appellant's Purported Good Faith is Legally Insignificant ............... 53

F.      Any Doubts Should be Resolved in Favor of Appellee, the Prior
        User ...................................................................................................... 54

VIII.   CONCLUSION .................................................................................. 54

CERTIFICATE OF FILING AND SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

***A.T. Cross Company v. Jonathan Bradley Pens, Inc.***,
    470 F.2d 689 (2d Cir. 1972)(Friendly, J) ......................................................54

***Bank of America National Trust and Savings Association v.***
***The American National Bank of St. Joseph***,
    201 USPQ 842, 1978 WL 21292 (TTAB 1978) ..........................................39

***Blaw-Knox Co. v. Siegerist***,
    300 F. Supp. 507 (E.D. MO 1968), *aff'd and modif'd in part*
    414 F.2d 375 (8th Cir. 1969) ......................................................................45

***Boyds Collection Ltd. v. Herrington & Co.***,
    65 USPQ2d 2017 (TTAB 2003).....................................................................51

***Carslile Chem. Works, Inc. v. Hardman & Holden Ltd.***,
    434 F.2d 1403 (CCPA 1970)........................................................................54

***CBS Inc. v. Morrow***,
    708 F.2d 1579 (Fed. Cir. 1983) ...................................................................10

***Coach Servs., Inc. v. Triumph Learning LLC***,
    668 F.3d 1356 (Fed. Cir. 2012) ...................................................................33

***Consolidated Edison Co. v. NLRB***,
    305 U.S. 197 (1938)......................................................................................32

***Corporation Habanos, S.A.***,
    102 USPQ2d 1085 (TTAB Feb 16, 2012).....................................................39

***Cunningham v. Laser Golf Corp.***,
    222 F.3d 943 (Fed. Cir 2000) ................................................................31, 32

***Entrepreneur Media, Inc. v. Smith***,
    279 F.3d 1135 (9th Cir. 2002) .....................................................................50

iv

*Exxon Corp. v. Fill-R-Up Systems, Inc.*,
  182 USPQ 443 (TTAB 1974) ....................................................................51

*Famous Horse Inc. v. 5th Ave. Photo Inc.*,
  624 F.3d 106 (2d Cir. 2010) ...................................................................46

*Federated Foods, Inc. v. Fort Howard Paper Co.*,
  544 F.2d 1098 (CCPA 1976) ..................................................................32

*Ford Motor Co. v. Summit Motor Prods., Inc.*,
  930 F.2d 277 (3d Cir. 1991) ...................................................................43

*Gen. Mills, Inc. v. Fage Dairy Proc. Indus. S.A.*,
  100 USPQ2d 1584 (TTAB 2011) ............................................................43

*Hercules Inc. v. Nat'l Starch and Chem. Corp.*,
  223 USPQ 1244 (TTAB 1984) ................................................................34

*Hewlett-Packard Co. v. Packard Press, Inc.*,
  281 F.3d 1261 (Fed. Cir. 2002) ..............................................................32

*HRL Associates Inc. v. Weiss Associates Inc.*,
  12 USPQ2d 1819, 1989 WL 274391 (TTAB 1989),
  *aff'd on other grounds,*
  902 F.2d 1546 (Fed. Cir. 1990) ..............................................................44

*In re E.I. du Pont de Nemours & Co.*,
  476 F.2d 1357, 177 USPQ 563 (CCPA 1973) .................................*passim*

*In re Gartside*,
  203 F.3d 1305 (2000) .............................................................................32

*In re Majestic Distilling Co., Inc.*,
  315 F.3d 1311, 65 USPQ2d 1201 (Fed. Cir. 2003).................................5, 31

*Jack Wolfskin Ausrustung fur Draussen GMBH & Co., KGAA v. New Milennium Sports, S.L.U.*,
  14-1789 slip op. (Fed. Cir. Aug. 19, 2015) ...................................35, 37, 40

*King Candy Co. v. Eunice King's Kitchen, Inc.*,
  496 F.2d 140 (CCPA 1974)......................................................................45

*Koppers Co. v. Krupp-Koppers GmbH*,
   517 F. Supp. 836 (W.D. PA 1981) ..................................................45

*Mag Instrument Inc. v. Brinkmann Corp.*,
   96 USPQ2d 1701, 1713 (TTAB 2010), *aff'd. mem.*
   2011-1052, 2011 WL 5400095 (Fed. Cir. Nov 9, 2011)..............................53

*Massey Junior College, Inc. v. Fashion Institute of Technology*,
   492 F.2d 1399 (CCPA 1974)..........................................................42

*Matsushita Elec. Indus. Co., Ltd. v. Nat'l Steel Constr. Co.*,
   442 F.2d 1383, 170 USPQ 98 (CCPA 1971) ......................................6, 20

*Mattel Inc. v. Funline Merchandise Co.*,
   81 USPQ2d 1372 (TTAB 2006)........................................................33

*McNeil-PPC v. Guardian Drug Co.*,
   984 F. Supp. 1066 (E.D. Mich. 1997) .............................................45

*Octocom Sys., Inc. v. Houston Computer Servs., Inc.*,
   918 F.2d 937 (Fed. Cir. 1990) ...............................................10, 33

*On-Line Careline, Inc. v. Am. Online, Inc.*,
   229 F.3d 1080 (Fed. Cir. 2000) ...................................................32

*Recot, Inc. v. M.C. Becton*,
   214 F.3d 1322 (Fed. Cir. 2000) ...................................................43

*Rissetto v. Plumbers and Steamfitters Local 343*,
   94 F.3d 597 (9th Cir. 1996) .......................................................41

*Royal Crown Cola Co. v. Bakers Franchise Corporation*,
   150 USPQ 698, 1966 WL 7286 (TTAB 1966), *aff'd*,
   404 F.2d 985 (CCPA 1969)..........................................................40

*Safer Inc. v. OMS Investments, Inc.*,
   94 USPQ2d 1031 (TTAB 2010).......................................................51

*Shen Manufacturing Co. v. Ritz Hotel Ltd.*,
   393 F.3d 1238, 73 USPQ2d 1350 (Fed. Cir. 2004)..................................33

***Specialty Brands, Inc. v. Coffee Bean Distributors, Inc.***,
    748 F.2d 669 (Fed. Cir. 1984) ....................................................42

***Squirtco v. Tomy Corp.***,
    697 F.2d 1038 (Fed. Cir. 1983) ...................................................41

***Stone Lion Capital Partners, L.P. v. Lion Capital LLP***,
    746 F.3d 1317 (Fed. Cir. 2014) ...................................................43

***Television Enterprise Network, Inc. v. Entertainment Network, Inc.***,
    630 F. Supp. 244 (D NJ 1986).....................................................45

***Top Tobacco, L.P.***,
    101 USPQ2d 1163, 2011 WL 6099691 (TTAB Nov 21, 2011) .............19, 52

**Statutes:**

15 U.S.C. § 1052(d) ......................................................................32, 45

15 U.S.C. § 1057...............................................................................29

15 U.S.C. § 1067.................................................................................1

15 U.S.C. § 1071(a)(1).........................................................................1

15 U.S.C. § 1071(a)(2).........................................................................1

15 U.S.C. § 1071(a)(3).........................................................................1

28 U.S.C. § 1295(a)(4)(B) ...................................................................1

**Regulations:**

7 C.F.R. § 11.18(b) ...........................................................................31

37 C.F.R. § 2.106(b)(2)(ii)..................................................................28

37 C.F.R. § 2.145(d)(1).........................................................................1

**Other Authorities:**

***4 McCarthy on Trademarks and Unfair Competition***
§ 23:6 (4th Ed.) ......................................................................................44, 45

TBMP 704.08(b) ...................................................................................51

TBMP 708 (2nd Rev. 2004) ....................................................................52

TMEP § 1207.01(b) ...............................................................................43

Trademark Rule 2.122(e) .......................................................................51

Trademark Rule 2.20...............................................................................31

**STATEMENT OF RELATED CASES**

Appellee certifies that there have been no previous appeals in this case, and is unaware of any case that will directly affect or be directly affected by the Court's decision in this case.

# I.    JURISDICTIONAL STATEMENT

This is an appeal of Opposition 91202418, decided by a panel of the USPTO Trademark Trial and Appeal Board (herein "TTAB") under 15 U.S.C. § 1067.  A final Decision and Opinion in the Opposition issued May 22, 2015(A000001-24).

Appellant filed Notice of Appeal in this Court and the USPTO on July 21, 2015 under 15 U.S.C. § 1071(a)(2) and 37 C.F.R. § 2.145(d)(1). Appellee timely entered its appearance on Sept 15, 2015.

This Court has jurisdiction over this appeal under 15 U.S.C. § 1071(a)(1) and 28 U.S.C. § 1295(a)(4)(B). Pursuant to 15 U.S.C. § 1071(a)(3), this Court docketed this appeal on September 3, 2015 as appeal number 15-1976.

# II.    STATEMENT OF THE ISSUE

In a case of **Initial Interest Confusion**, whether the TTAB's ruling, based on a thorough review of the **relevant *duPont*** factors, that there is likelihood of confusion between Appellant's slogan "**BUILDING ASSETS FROM IDEAS**" and Appellee's incontestable Registrations: 2,090,854; 3,129,158; and 3,215,068, all for the marks "**TRANSFORMING IDEAS INTO BUSINESS ASSETS**" for *identical services*, is supported by substantial evidence.

### III.    STATEMENT OF THE CASE

**A.    TTAB Decision Appealed-from by Appellant/Applicant Alley**

Appellant Ryan Alley, doing business as Ryan Alley Intellectual Property

Law ("Alley"), seeks reversal of the TTAB Decision in Opposition 91/202,418

decided May 22, 2015 (A00001-24). That Decision sustained the Opposition of

Appellee and refused registration of Alley's mark, BUILDING ASSETS FROM

IDEAS.

**B.    Appellant/Applicant's Application**

On June 9, 2011, Appellant filed application SN 85/342,228 for registration

on the Principal Register for the slogan mark "BUILDING ASSETS FROM

IDEAS" ("Alley's slogan mark")(A74001- 2), alleging actual use for legal services

in the field of intellectual property law, including patent, trademark, copyright, and

trade secret procurement, transfer, and enforcement.

**C.    Institution of Opposition Following Notice to Appellant Alley**

Following publication for opposition on November 2, 2011 of Appellant's

slogan mark, Appellee, Innovation Law Group, Ltd. (herein per context:

"Appellee", "Opposer" or "ILG"), was notified by its watch service, Thompson

Reuters, of Appellant's filing (A63007, ¶7 b.). ILG notified Alley of its concerns

regarding his filing to register a confusingly similar mark (A01007, ¶10, Exh 7 – 9

at A01026-31). After Alley continued use which ILG deemed inappropriate, ILG

filed a Notice of Opposition on November 3, 2011 (A01001 - 31) claiming a likelihood of confusion with, and dilution of, incontestable US Registrations: 2,090,854; 3,129,158; and 3,215,068, on the standard character slogan and composite marks "TRANSFORMING IDEAS INTO BUSINESS ASSETS" ("ILG's marks") (A01001-20; A75001 – 7) in Classes 35 and 42, inter alia for legal services relating to intellectual property law and strategy. Registration 3,215,068 is a composite mark. Appellee is also owner of Registration 4,031,077 dated March 12, 2013 for the slogan mark "TRANSFORMING IDEAS INTO ASSETS" for legal services relating to intellectual property law, strategy, transactions and enforcement in Class 45 (A53006, ¶ 13; Exh 26 at A53013-16).  The TTAB considered Appellee's incontestable Registration 2,090,854 as exemplary of its registrations for purposes of the likelihood of confusion issue in the Opposition. (A00008)

### D.    Opposition Proceedings and Evidence Adduced

The parties stipulation for testimony affidavits or declarations in lieu of depositions was approved by an Order dated Oct 31, 2013 (A37001).

In a Decision on Appellant's Motion for Summary Judgment (A26001-8), the Board held that they did "not find relevant' the Alley evidence "regarding an alleged lack of actual confusion given applicant's admitted limited use of his mark "only on [his] website and related Internet pages linking thereto. . . and because the 17 months of concurrent use of the parties' marks. . . is relatively short " (A29006, n 6).

Numerous objections to the evidence were filed by both parties. The Board

considered Appellee's objections to the admissibility of Appellant's opinion

Declarations and proffered evidence of 3rd party website use[1], holding (A00004)

(emphasis supplied):

> "None of the evidence sought to be excluded is outcome
> determinative. Moreover, the Board is capable of weighing the
> relevance and strength or weakness of the objected-to testimony and
> evidence, including any inherent limitations, and this precludes the
> need to strike the testimony and evidence. Given these facts, coupled
> with the number of objections, **we see no compelling reason to
> discuss the specific objections in detail.** As necessary and
> appropriate, we will point out any limitations applied to the evidence
> or otherwise note that the evidence cannot be relied upon in the
> manner sought. **We have considered all of the testimony and
> evidence introduced into the record. In doing so, we have kept in
> mind the various objections raised by the parties and we have
> accorded whatever probative value the subject testimony and
> evidence merit."**

Appellant stipulated that Appellee has standing and priority, the services and

the trade channels are the same (A29002-3). The TTAB so ruled (A00006-7).

Appellee ILG provided eight Testimony Declarations supported by evidence

(A00005-6), of which four: Dulin: van Os: Parks: and Dennis, were percipient

witnesses as to the use and effect of Appellee's marks (A38001-21 and 36-149;

A63002-55). Appellee also provided two expert Declarations: Kirk V. Thomas, an

Internet, website, and Google Analytics expert (A38028-35); and Laurel Black, a

---

[1] Appellee did not waive its objections to admissibility by responding to them
below or here. The Board should have excluded the alleged 3rd party use and the
unsupported self-serving opinions of Appellant.

nationally-renown marketing expert in the field of corporate identity, brand building, and communications (A38022-27). Appellant only provided declarations by himself, offering no expert or independent percipient witnesses. (A43002-37; A6002-37; A43002-37, refiled as A61002-37). In rebuttal of statements in the Appellant's declarations, Appellee provided two rebuttal declarations: one each of Dulin (A53002-18; Exhibits at A38036-149), and marketing expert Black (A53019-25).

### E.    The TTAB Decision and Opinion

After Oral Argument, a panel of the Board **unanimously sustained the Opposition** of ILG, and Refused Registration (A00001-24). The Decision was rendered in a non-precedental, 24 page, Opinion by Administrative Trademark Judge Bergsman, focusing in detail on the **sole issue of likelihood of confusion**. Judge Bergsman prefaced the Decision by stating (A00007)(emphasis supplied):

> "**Our** determination under Section 2(d) is based on an analysis of **all of the probative facts in evidence that are relevant** to the factors bearing on the issue of likelihood of confusion. *In re E. I. du Pont de Nemours & Co.,* 476 F.2d 1357, 177 USPQ 563, 567 (CCPA 1973). *See also In re Majestic Distilling Co., Inc.,* 315 F.3d 1311, 65 USPQ2d 1201, 1203 (Fed. Cir. 2003)."

The Board focused on two key considerations: a) Similarities between the marks, and b) Similarities between the services, finding that "For purposes of determining likelihood of confusion, the services are identical)(A00008). The Board noted that besides those considerations, "any other relevant *du Pont* factors in the proceeding now before us, will be considered in this decision." (A00007)

###### F.    Findings by the Board

In its Decision, the Board made eleven findings in connection with its review of the *duPont* factors (at: A00008; A00013; A00014, fn 38; A00018; A00019-20; A00021-22; A00024). Appellant below provided Internet cites to alleged 3rd party use which were objected-to by Appellee on grounds of: lack of foundation; hearsay and/or irrelevant; and lack of authentication and corroboration. In its evaluation the Board deemed such citations of similar taglines simply "corroborated what we intuitively knew. . . the mark [of Appellee ILG: TRANSFORMING IDEAS INTO BUSINESS ASSETS] is highly suggestive." (A00018)   The Board followed the law that suggestive marks are entitled to protection, stating (A0019-20):

> "we must keep in mind what the Court of Customs and Patent Appeals, the predecessor or our primary reviewing court, said in *Matsushita Elec. Indus. Co., Ltd. v. Nat'l Steel Constr. Co.,* 442 F.2d 1383, 170 USPQ 98, 99 (CCPA 1971), in finding likelihood of confusion between uses of NATIONAL in a cancellation proceeding:
>
>> Neither trademarks nor the public are adequately protected unless decisions in cases of this kind are based on a realistic appraisal of the likelihood of purchasers or prospective purchasers being confused as to source regardless of theoretical "weakness" of a mark."

The Board held that "**both marks** mean and engender the [same] commercial impression" (A00021-22) and "are similar **in their entireties** in terms of appearance, sound, meaning and commercial impression."(A00022). The Board concluded its analysis holding (A00024)(emphasis supplied):

6

"**we find that Applicant's mark** BUILDING ASSETS FROM
IDEAS for "legal services in intellectual property, including patent,
trademark, copyright, and trade secret procurement, transfer, and
enforcement" **is likely to cause confusion** with TRANSFORMING
IDEAS INTO BUSINESS ASSETS for "legal services relating to
intellectual property law and strategy."

## IV.    STATEMENT OF FACTS

Appellee disagrees with Appellant's Statement of Facts as being slanted and

incomplete, and accordingly supplements the Statement of Facts as follows:

### A.    Opportunity for Actual Confusion to Have Occurred

*First*, Appellant, Ryan E. Alley, is proprietor of Ryan Alley Intellectual

Property Law, engaged in solo IP practice since mid- 2011 in Arlington, Virginia.

During all times of the prosecution of his application, the Opposition and this

Appeal, he only references "online" advertising (A63009-11), in a website under

his trade name: Ryan Alley Intellectual Property Law. No other interstate

commerce marketing evidence was adduced.  The evidence shows Appellant's

mark was invisible on the Internet between his inception in May 2011 until March

2013 (A43006; A38031; A63011-12).

Alley stated under oath in his application that the date of his first actual use

of the slogan mark in interstate commerce, via the Internet, was "at least as early as

May 26, 2011". However, by his own admission, Appellant's mark was not

Internet searchable for almost 2-years thereafter, Alley having instructed a designer

creating his website that the slogan was to be embedded in a trade name image

block (A43006).  The impossibility of searching his slogan, because it was

embedded in an image, was called to Appellant's attention in Appellee's January

2013 Thomas Declaration (A38028-35, ¶¶5, 6, 7, 10, 11). Thomas testified about

the non-searchable location of the Alley slogan (A38032-33)(emphasis supplied):

> "11.    To prove the point addressed in the paragraphs above, on
> January 9, 2013, I went to Google and entered the following search:
> site:alleylegal.com "building assets from ideas".  This is a focused
> Google search going directly to the Alley Website and searching for
> the exact phrase in quotation marks.  This query I searched resulted in
> no documents found on the Alley Website for that exact phrase (the
> upper or lower case of the words is immaterial to the search).  This is
> **because those exact words are found only in the embedded image**
> **and the hidden keywords of the Alley Website, and those words**
> **are not indexed by Google and are not searchable.**  Because of
> these facts, I believe that **no one searching in Google just for the**
> **words "building," "asset," or "idea" would find the Alley Website**
> **because those words are not repeated in the actual displayed text**
> **of the Alley Website (outside of an embedded image or outside of**
> **the linked blog portion of the site which could change more**
> **frequently)**.  Likewise, the actual phrase, "building assets from ideas"
> is not repeated in the displayed text of the Alley Website and this
> exact phrase would not be found by a Google searcher, using those
> search terms."

That shows Appellant's slogan was invisible in the sole marketing channel

he used in 2011, 2012 and part of 2013. After the Thomas testimony, Appellant

changed his webpage, he says in March 2013, by embedding the slogan into text.

At the same time he copied Appellee's gear theme.[2]  Until well into the Opposition

testimony period, March 2013, the only way to find Appellant on the Internet was

---

[2] (A38028-35, 66-67; A63011-12; A53003). See Alley Testimony Declaration, Feb
28, 2014, ¶ 7 (A43006, ¶7).

through his trade name, not the slogan which he seeks to register. **For nearly two years, the invisible Alley slogan could serve no marketing function, *per se*, and could not be the basis for an instance of actual confusion.**[3]

Appellant testifies that consumer selection of legal service providers is "identity driven", resulting from "referrals and in-person introductions" followed by "interviews" with potential clients.[4] Appellant testifies to a lack of marketing function of his slogan, stating in his Declaration of Feb 28, 2014: "**I have never been identified by or asked about my slogan "Building Assets from Ideas" in these conversations**" (with potential clients) (A43011-12, ¶17).[5] Appellant's marketing identity is his trade name: "Ryan Alley Intellectual Property Law."[6]

***Second***, by arguing that no actual confusion means no likelihood of confusion (not the law), Appellant seeks to misdirect the Court by misrepresenting there is significance in geographical separation of **physical location** of the parties. Appellant's "Statement of Facts" misrepresentation is: "Applicant [Appellant ] and Opposer [Appellee] are both providers of legal services in intellectual

---

[3] In this regard, since invisible, no attempt to link Appellees mark with his could show up in Google Analytics.

[4] Alley Declaration 02-28-14, ¶16 (A43011, ¶16).

[5] This comment appears to be an attempt at misdirection.

[6] Of course that raises the question, if his slogan serves no marketing function, why should Appellant want such a slogan mark, much less fight so hard to register it when he could easily pick another slogan? It follows by Appellant's actions that he admits the slogan is a powerful client motivation-to-contact tool.

property, with practices **on opposite sides of the country**", Appellant's Brief, pg 3. He also states "Opposer is a small IP law practice in Washington state", *id*.

**In contrast to Appellant**, Appellee provided uncontested documentary and testimonial evidence showing an extensively advertised broad practice scope: a long period of National and International legal practice, including continuous use of its registered slogan marks since 1996 (A63002-55; A38036-149; A38002-10, 15-21).  During the use of its registered mark TRANSFORMING IDEAS INTO BUSINESS ASSETS, Dulin, the principal of Appellee,  was a partner of the well-known **Virginia** firm of Oblon, Spivak, McClelland, Meyer and Neustadt, managing its West Coast Office, then located in San Jose, CA. In addition, Dulin, during his >40-years of practice (as ILG for the past 15) has been admitted in, and has had clients in, Virginia, Illinois, California and Washington, as well as extensive practice before the USPTO in **Virginia**.

*Third*, Alley argues that the period of geographic isolation[7] and lack of a documented instance of actual confusion is 4 years (Appellant's Brief, p 26, n 1), including time after testimony closed and counting the almost 2-year "invisibility period". Based on this, Alley seeks to overturn the Board's finding that the argued

---

[7] Geographical isolation is irrelevant in view of Alley's heavy reliance on the Internet. Both parties being registered to practice before the USPTO, their patent practices are nationwide. See Argument below pg 33, fn 33 citing ***Octocom Sys., Inc., v. Houston Computer Servs., Inc.***, 918, F.2d 937 (Fed. Cir. 1990). See ***CBS Inc. v. Morrow***, 708 F.2d 1579 (Fed. Cir. 1983).

concurrent use period is given a "neutral" weighting in the ***DuPont*** factors analysis. However, the Board accorded Alley a period of 2 ½ years of simultaneous use from the close of Opposer's testimony period to the date of decision. That is generous in favor of Appellant, in that it gives him credit during this litigation, and an additional period of 3 months during invisibility.  Since the Opposition was filed on Nov 3, 2011, mid-way through the admitted 2011-2013 invisibility period (A43006), there is substantial evidence to support an even shorter period of barely over 2 years for an opportunity for actual confusion to arise. Factually, this factor should not weigh neutral, but rather toward a finding of likelihood of confusion, particularly in view of no evidence of other types of advertising or scope of practice by Appellant.

The Board's found a significant gap in Appellant's evidence: "**we do not have any evidence regarding the extent of Applicant's advertising or the geographic scope of his practice".** That finding is well supported. The **absence of Appellant's evidence is not factual evidence of absence** of potential for confusion. The burden was on Appellant to prove the extent of his advertising and geographic scope beyond an Internet listing of his **trade name**, during which his slogan was embedded in a non-searchable image.

**B.      Degree of Sophistication of Clients**

Appellant conflates representations of his **process of informing prospective clients after initial contact**, with the **degree of care taken by sophisticated purchasers** of IP services, while ignoring the **Initial Interest Confusion** nature of this case.

As a result of Alley's client informational process arguments, the Board found that "purchasers selecting intellectual property counsel would exercise a high degree of care" (A00013). The Board weighed the degree of care in favor of finding no likelihood of confusion. Rather, the facts show that weight should be no worse than neutral, yet the **function** of the marks **to motivate contact** is a highly positive factor showing likelihood of **pre-sale** confusion, also known as **Initial Interest Confusion**.

Appellee and Appellant market to **both** sophisticated and unsophisticated clients. As for Appellant, a sole IP practitioner representing individuals, some of his clients are unsophisticated. Alley acknowledges this, stating in his Declaration: "I have been involved with client servicing and development for **a broad range of consumers**. . .", including "**completely IP-unaware individuals** and start-up companies. ." (A43008, ¶ 12), which he calls "**unsophisticated consumers** unfamiliar with IP. . ." (A43012, ¶ 18).

Appellee's slogan speaks to **both** classes of consumers equally, unsophisticated and sophisticated potential clients, albeit in somewhat different ways. Appellee's slogan mark functions as a strong tool to motivate clients to contact the service supplier: It tells both classes of clients what Appellee does and that it understands their goal for IP protection (A38022-27; A38011-14; A38001-10; A63002-55; A53002-29). The nature of the services, the channels of trade and the targeted classes of consumer clients are the same for both parties. These are three positive factors in favor of likelihood of confusion (A00008 – 9).

Appellee's mark is fully searchable[8]. Indeed, the flash page of Appellee's website highlights the two words held by the Board to be key in the likelihood of confusion analysis: IDEAS and ASSETS, which are inscribed on two rotating, inter-meshing gears (A38067).  Significantly, Appellant's webpage at the same time, and for some unknown period, used gears as the background image right next to his slogan (A38066).[9]

 Appellee provided uncontested expert testimony by nationally renown branding expert Black. She compared the distinctive nature of Appellee's registered mark with the tagline (slogan) of Appellant (A38024, ¶ 6):

---

[8] See Thomas Declaration, yielding 19 pages of results, A38028-36 at pg 32, ¶13.
[9] Leading to a reasonable inference of bad faith.

"The taglines under consideration here [Appellant/Applicant's BUILDING ASSETS FROM IDEAS and Appellee/Opposer's TRANSFORMING IDEAS INTO BUSINESS ASSETS] are also distinctive in providing this goal:  the development of the idea into an asset."

With respect to **unsophisticated inventors,** Black's unrebutted expert testimony explains how this type of trademark functions (A38024, ¶ 6)(emphasis supplied): "For **unsophisticated** inventors, the taglines crystallize a path to a goal."

Black then testified regarding **sophisticated** inventors, entrepreneurs and executives, likewise un-rebutted, as follows (id)(emphasis supplied):

"For **sophisticated inventors, or entrepreneurs and executives** whose responsibility is to protect the Intellectual Property of a company, the tagline appears concisely expressive, and therefore **shows** that the firm understands that the company needs to convert its IP into assets, **exactly what the prospect seeks**."

Appellant Alley conflates the **duty** of fully **informing** a prospective client **after initial contact**, with their degree of **sophistication** (ability to understand the information). The Board looked to the declaration testimony of Appellant reciting his **disclosures** to prospective clients as showing clients take **a great degree of care** in selecting attorneys to represent them. But that occurs **after** the marks have functioned as they should, to motivate the client to make initial contact with the attorney/firm (see discussion in the Argument below, § VII C., pp 43-47). It is only **after** initial interest contact motivation that the **degree of care informational process** begins, in satisfaction of Bar requirements.  Factually, the Board over-

weighed a post-confusion, required informational process as a degree of care factor.

### C.    Informing a Client Is a Duty, Whether Sophisticated or Not

As to **informing** the client, Appellant does no more than what Appellee does, and states on the ILG "Contact Us" page (emphasis supplied)(A01001-31; see A01006-7, Exh 5-6 at A01021-25):

> "We can answer your general questions about our legal practice by phone or email. But in order to answer specific questions about your project, and **to help you determine whether you would like to retain us as your Intellectual Property Counsel, we offer a one-on-one Initial Client Conference, which can last up to two hours. There we will answer all of your questions, provide you with information about the process, and advise you on options for pursuing your project.** "

Fully **informing** a client, regardless of whether they are **sophisticated or not** is a **requirement** of all Bars, and is **not** solely determinative of the degree of care exercised by purchasers of the legal services offered. The degree of care more properly should be weighed at the initial point of encounter, the presentation of the contact-motivation slogan. Thus, as to degree of care, at worst, that factor is factually neutral, as information must be provided to both classes of prospective clients equally.

### D.    Function of Both Marks in Marketing Legal Services: Contact Motivation

As a result of extensive Appellant testimony about the informational disclosure **after** client contact, Appellee's testimony about the **function** of the mark was under-weighed by the Board, which under-weight Appellant seeks to perpetuate. When Dulin testified that some of Appellee's clients remarked that its registered mark is "cool" (A53004), that was not proffered as evidence that prospective clients for IP services are unsophisticated. Rather, Appellee's evidence points out that the **nature of the mark functions as contact motivation**: to inform prospective clients of **both** a path to a goal **and** that the firm understands that the prospect needs to convert its IP into assets. (A38022-27; A38011-14; A38001-10; A63002-55; A53002-29).

Indeed, the unrebutted expert evidence is that **both marks function to provide contact motivation, a key goal of professional services brand development**. Black, the nationally renowned branding expert, testified in her Declaration, ¶5 (A38023-24)(emphasis supplied):[10]

> "5. **Both of the marks** at issue are word marks as distinct from logos or composite marks (logos + words), and both **function as branding "taglines,"** telling the prospective client the strategic goals the respective firms offer, with respect to providing the legal services. Taglines, also known as slogans, function to provide prospects with a condensation of the essence of the service or product offered, so that

---

[10] Her Declaration was cited with approval by the Board. Alley did not provide admissible evidence in rebuttal, merely self-serving, irrelevant attorney opinion.

they can quickly "get" what the firm can do for them. **Such taglines are intended, in connection with services, to motivate the prospect to make initial contact,** or in the case of an Internet presence, to click on the "Contact Us" button on the firms' web page. Such **contact motivation is a key goal of professional services brand development taglines."**

Dulin testified in his rebuttal Declaration (A53004, ¶7) that: "clients have indicated to me that the ILG mark piques their interest in what we do, and **motivates them to contact us**." Appellant agrees, stating "I conceived Applicant Mark **as a catchy way of restating intellectual property services** that used the quirky term 'build'. . ." (A43002, ¶3; refiled as A61002,¶3)(emphasis supplied). Appellant's slogan is alleged by him to be "catchy" whereas ILG's is "cool", but factually they **both** serve the same function: **contact motivation**.

Appellant consistently refers to his mark, as a "slogan" or "four word slogan," Appellant Declaration, (A43003, -8, -33; ¶¶ 7, 17, 24; refiled: A61003), and in his brief in the Opposition below (A59013, -19, -27, -28).   Appellant's slogan is a catchy way to motivate prospective clients to inquire about his services, only **after which** Alley induces them to engage him.

As further factual evidence before the Board, percipient witness Parks, Treasurer and principal of TP Solar, Inc. of Paramount, CA a solar cell equipment manufacturer, testified on the importance of contact motivation as an important function of Appellee's mark (A38013, ¶5)(emphasis supplied):

17

"5.   On checking out ILG's website, I was immediately struck by the ILG slogan "Transforming Ideas Into Business Assets". I found the slogan to be creative, attention-getting, and insightfully outside the box. When hiring a lawyer I believe it is important that the lawyer knows more than just "the law" but also that the lawyer knows how to apply the law toward client goals. While some applications of the law are "standard" other situations require the lawyer/advocate to be creative and to consider the facts and issues from a number of different angles. ILG's slogan immediately conveyed to me that the firm thinks creatively and strategically. I believe these characteristics exhibit cost effective, goal oriented lawyering, characteristics of the type of law firm that we were looking for as being best for my company's needs. **The slogan was a powerful and primary motivation for me to call Mr. Dulin regarding the services of ILG, and how a long distance relationship would work out. Accordingly I promptly called and interviewed him by phone."**

Parks continues in his Declaration ¶6, id., to describe the **subsequent** information interview, after which Appellant/ILG was engaged by TPSI.  This is solid factual evidence of the initial interest nature and function of Appellant's marks. Appellee presented no evidence whatsoever on this decisive factor.

### E.    Policing Efforts by Appellee/Opposer/ILG of its Incontestable Marks:

Under the heading "IP Services Landscape"` in Appellant's Brief, Alley presents a list of 62 Internet "sources" spread over 8 pages  purporting to show third party uses. Appellant claims this provides factual support for his argument about concurrent use without occurrence of actual confusion. **No registrations are cited**. Appellee, Opposer below, filed objections to these citations on the grounds that they were neither probative of use in commerce as trademarks, nor

accompanied by non-hearsay evidence indicating the length of time of alleged usage, the degree of exposure or the impact of such uses.[11] Indeed, Appellant cites repeatedly to "**web.archive.org**", or "**webcache**", or "404 Page not found" links.

Appellee pointed out to the Board below that descriptive fair uses are irrelevant under the 6th ***duPont*** factor, and factually inconsistent with Alley's argument that his similar slogan is a trademark suitable for registration.[12]

Appellant's 62-item Brief-list is a misleading rehash of his submission below, which the Board fully considered. The Board broke the list down into potential trademark uses vs. text uses, some in ads, leaving out many misleading duplicates (multiple links to the same site, making it appear like more than one "user"), books and articles, non-legal services uses, and entities outside the United States. The Board considered in detail the resulting 17 "most relevant examples of law firms using the same or similar marks as taglines" (see chart at A00014 – 16)[13].

After a thorough review, the Board held that the third party "use" only "corroborates what we intuitively knew. . . [Appellee's mark]. . . "is highly suggestive" (A00018).  The Board then pointed out, regardless, suggestive marks

---

[11] A66002-34,  11-13, Citing ***Top Tobacco L.P.***, 101 USPQ2d 1163, 2011 WL 6099691, *8-9 (TTAB Nov 21, 2011).

[12] A66012, n 6. Appellant argued to the Board that Appellee's mark contained "commonplace elements" (his Brief, p 16), and that the record lacked "any evidence of suggestiveness".  Not only does Appellant confuse the burden of proof, but Appellee's incontestable registrations establish, as a matter of law, that its marks are ***not*** descriptive.

[13] Indeed, Appellant's prolix list constituted 135 cites, most duplicates.

are entitled to protection, citing ***Matsushita Elect. Indus. Co., Ltd. v. Nat'l Steel Constr. Co.,*** 442 F.2d 1383 (CCPA 1971). All three of Appellee's marks are incontestable.

Rather than address any supposed errors in the Board's analysis and distillation of the original 67-item list down to 17 "most relevant" ones, Appellant merely repeats all of them in his Statement of Facts as if they were proven "uses". Appellant argues that the Board erred in the weight given them as if they were facts. This is misdirection, as there was no legally probative real use evidence proffered by Appellant to support the alleged use cites.

Essentially Appellant, in disregard of the limitations on this Court's resources, invites the Court to take hours to examine each of his mass of links. As a matter of fact, the Board already did that detailed analysis, winnowing down the Alley cites to a 17-item list, because, as non-existent or mere archives, the **remainder** cannot be evidence of current use. The excess Alley cites are simply Internet fossils which are not probative of 3rd party concurrent use. Appellant does not point to any probative evidence he provided the Board that anyone looking for legal services would search The Wayback Machine, "web.archive.org", or Google "webcache" pages. Factually, those are simply not trademark use evidence.

By way of factual analysis of Appellant's Brief list[14]: the first 10 items (corresponding to Board #1) are the same, referring to Hoffman and Baron. Per its standard practice of contacting infringers, Appellee is in contact with it to terminate its use (A53005-6; A63008).  As for Appellant's #'s 11, 12, Schell, dba Rocky Mountain Patent (Board #2), Appellee sent him a cease and desist letter; as a result he abandoned his trademark application. Others are non-trade mark uses and irrelevant. For example Appellant's, #13 (not listed by the Board) leads to a social page that states "The Meetup Group you're looking for doesn't exist". #14 was a site for linking freelancers with jobs; its non-legal services trademark "use" page no longer exists (not listed by the Board). #15, 16 Fletcher (Board #3) has been sent a cease and desist letter. Appellee sent a cease and desist letter to Fountainhead Law, #17, 18 (Board #4), and it agreed to terminate use. #19 (Board #5), "firstpointip" cite leads nowhere, a blank page, and is meaningless as showing any use.

Appellant's  #s 20, 21, 22 (Board #6) are duplicates to Scott Redmond, a San Francisco patent agent, dba Clever Industries; #20, 21 in fact do not use the slogan; the URL goes to a password protected log-in page for existing clients of "Innovation Center"; #22 is Redmond's listing, and there is no longer the use

---

[14]   In the fact summary which follows, Appellee follows the 17-item list in the Board Opinion (A00014-16) rather than the 62 items in Appellant's Brief. Thus the first item in the Board's chart is herein termed "Board #1", and that is keyed to the items from Appellant's list in the chart on his Brief pages 4-11.

attributed.  #23, 24 (Board #7) are duplicates of Clock Tower Law; Appellee sent it a cease and desist notice; it agreed to stop use (A63007-8). #25 – 27 (Board #8) are to the " Santangelo Law Offices - The Idea Asset Group": #25 returns a "404 Not Found" page; #26, the Home page, does NOT show the phrase Alley claims it does, nor under the firm name; #27 returns a notice "Wayback Machine doesn't have that page archived."

As for #28 and 30 (Board #9), "Steve Gruber Intellectual Property";  #28 returns a Wix.com "Error 404" page not found notice; #29 has no such language, and after contact by Appellee, the language in #30 was deleted from his Linkedin profile.  Appellant's #s 31, 32, Marbury Law, #31 is a "404 not found" link, while #32 is "not archived". Thus, the Board did not put 31-32 on its list. Appellant's #s 33 – 38 (Board #10), "Boston Legal Consultant Group, LLC" is not a law firm offering Intellectual Property Law services; rather, it is a 1-person business consulting service of Karmiah Boston in Atlanta Georgia; #33 returns a blank page with the message "bad file descriptor"; #34 is a Facebook page in which the slogan is cut-off and essentially unreadable; none of 33- 38 are legal services trademark usages.

The Board's chart #s 11, 12 and 15 – 17 use very different phrases. Board #17 is not for IP legal services. Board #13, Adams IP, LLC (Appellant #55), does not now appear to use the phrase "Ideas Into Assets"; rather, it uses three cycling

images with the phrases: "Enforcing rights for our clients, Pat. Pend."; "Protecting Business from Coast to Coast"; and "Building Assets One Filing At a Time." Board #14, Bateman IP (Appellant's #57 – 59), as of May 1, 2015 has merged with another firm and no longer uses the phrase "Where Innovation Becomes Assets."

The Board table (A00015 - 17) recites 8 examples of ad text (herein "items A – H"). Item A is again Redmond, who has ceased. Item B, Marbury Law is not found. Item G on pg 17 is a book title, not a legal services slogan. The rest are just text, not shown by admissible probative evidence to be trademark uses for the services in issue.

Thus, out of the 17 the Board singled-out after its thorough review as being "the most relevant examples" of Internet cites: 2 have no active page (#5 and 11): 2 more are not offering legal services (#s 10 and 17); 5 more are no longer using the listed phrases, if they ever did (#s 6, 8, 9, 13, 14); 4 more have or had different phrases or slogans (#8, 12, 15 and 16); 2 more have cease and desist demands pending (#s 1 and 3); and the remaining 6 have all stopped their usages of concern after enforcement by Appellee (#s 2, 4, 6, 7, 8 and 9). See A63002-55, A53002-18 and A38036-149 for Appellee's on-going policing efforts resulting in the stopping of the alleged third party uses.

The facts in evidence show that as part of its policing efforts, Appellee uses Thompson Reuters watch services to notify it of newly filed trademark applications (A63006-7; Exh 22-1 through 22-79 at A38069-149). Thompson promptly notified ILG of the filing by Appellant for registration of his slogan BUILDING ASSETS FROM IDEAS (A63007, ¶7b). Appellee requested Alley choose another slogan. Appellee did not "threaten" Alley with an Opposition. Rather, Appellant merely informed Alley that if he did not withdraw his application, the next step would be an Opposition proceeding, as ILG had done on previous occasions with other applicants (e.g., A63007). Appellant did not drop his application, so Appellee filed an Opposition Petition. The Trademark Office agreed that there were grounds for Opposition, which was instituted.

Alley claims in his Declaration that **he, personally**, "**conducted a . . . USPTO trademark database search . . . using 'asset' and 'idea' in combination**" and did **not** find Appellee's marks (A43002-3, ¶5, emphasis added; refiled as A61002-3). However, Appellee's percipient witness van Os, a registered patent and trademark paralegal with then-13-years experience in the field, testified that **an identical USPTO TESS search in fact** turns up Appellee's three uncontestable registrations, TRANSFORMING IDEAS INTO BUSINESS ASSETS. In her uncontested testimony she states (A26144; A38008-9), and her

Exhibits B-1 and B-2 show (A26149-150), that she searched both "(Ideas) **and**

(Assets)", and its inverse: "(Assets) **and** (Ideas)", with identical results:

> "10. Anyone searching the USPTO Trademark Search (TESS)
> database, even doing the Basic Wordmark Search under "(Assets) and
> (Ideas)" or "(Ideas) and (Assets)" would find the marks of the
> Opposer, see Exh B. [A26149-150, Exh B-1, B-2]"

The Board had the following van Os search evidence before it (A26149; A38008):



Items 1, 3, 4 and 7 are Appellee's marks (#1 is now Reg. 4,031,077). Item 2

is Appellant/Alley's application.  Items 5 and 6 are examples of Appellee's

enforcement against Keschner (A63007; A26080-82) and citation of Appellee's

mark against Cherdak, whereupon he abandoned his application (A63007, 47-48). A TESS search today under "(Ideas) and (Assets)" shows abandonment by Rocky Mountain Patent (Schell) who Appellee requested to cease and desist use.

It is uncontested fact that the **ONLY** registrations in such a "combination" search are those of Appellee.[15] Appellant's claim of no search results are contrary to fact. Appellant does not otherwise claim, much less substantiate, that he did any competent or thorough clearance search before filing his application.

Vigorously pursuing Appellant as part of enforcement by Appellee is substantial evidence of strong efforts to police its registered marks. There is substantial evidence in the record, on which the Board fairly relied, to find that Appellee has adequately policed all its marks over the years.[16] Appellee has successfully retained ownership of its trade name after misappropriation[17].  It also stopped confusingly similar uses of its "Ideas/Assets" marks, in addition to

---

[15] A 2-minute TESS search today confirms a combination search produces Appellee's registered marks.  The simplicity of locating ILG's registrations evidences a lack of candor and bona fide good faith on the part of Alley, reflecting broadly on the weight to be given to his self-serving opinions in his remaining declarations.

[16] See Dulin Declaration Exh 15 (A38036-45) and Exh 22 (A38069 – 148). Appellee had spent "tens of thousands of dollars in out of pocket costs and time value of firm services for policing" the mark at issue (A26054, ¶4 i, and today that number is obviously in excess of 6 figures.

[17] ILG v Gottlieb, Cancellation Petition 92-043533 Granted; Gottlieb's mark cancelled 9/24/2005; ILG's superseding Reg 3,105,968. (A26093-102; A38036-45).

Appellant: by Keschner[18]; Fountainhead[19]; Clock Tower Group[20]; Palet Valo[21];

Harshaw Research Group[22]; Thomas Communications, Inc.[23]; and Rocky Mountain

Patent LLC[24], with others pending.

Thus, in the period of 2004 to date, Appellee/Opposer has been involved in

active policing of its suite of marks, initiating 12 actions and currently successful

in 10, with this one actively on-going, and one other in discussion. The law does

not require Appellee to sue everyone at once; it is entitled to manage its resources

without loss of its trademark rights. Indeed, in view of the facts of extensive

enforcement by Appellee, there is substantial evidence to support that its continued

active efforts strongly weigh in favor of finding a likelihood of confusion.

---

[18] ILG v Elizabeth M. Kechner Ideas Are Assets; ILG Opposition sustained
3/17/2008 (A26080-82).
[19] ILG v Fountainhead Law Group, Cease and Desist sent 7/18/2012 after which
Fountainhead stopped use.
[20] ILG v Clock Tower Group, Cease and Desist sent 7/18/2012 after which Clock
Tower stopped use (A26053-54, 86-87).
[21] ILG v Palet Valo, Cease and Desist of June 11, 2004 resulted in Palet Valo
stopping thereafter (A26054, 89-92).
[22] ILG v Harshaw Research Group, July 6, 2004; Cease and Desist by ILG
complied-with by Harshaw (A53002-18; Ex 25-1 and 25-2 at A53011-12)..
[23] ILG v Thomas Communications, Inc.; Thomas' SN 11/041592 for Business
Transformation & Innovation was abandoned by it on 3/2/2007 (A53002-18; Exh
24-1 and 24-2 at A53009-10).
[24]  ILG is currently challenging Hoffman and Barron over its mis-use (A53005-6).

## VI.    SUMMARY OF THE ARGUMENT

**This case is about Initial Interest Confusion**, not about informing a post-contact prospect about the attorney's background in order to gain engagement. While the factual findings of the Board are supported by substantial evidence of record, properly weighed in the light of the nature and function of the marks in the arena of Initial Interest Confusion, the result would be even stronger for the conclusion of likelihood of confusion in favor of Appellee.

The Board reviewed all the ***duPont*** factors **relevant** to this case for which evidence was **properly** made of record. Appellee has long-standing priority, and all its marks, **TRANSFORMING IDEAS INTO BUSINESS ASSETS**, are incontestable.[25] Appellant has stipulated that the services, channels of trade, and target consumers are ***identical.***[26] Since Appellant filed no counterclaim, he is barred from attacking Appellee's registrations directly or collaterally on the basis that they are either generic or merely descriptive[27] (A260012).  Appellant's purported good faith in choosing his mark is legally insignificant, and his claim

---

[25] A fact that Appellant fails to mention in his Brief; Opposer has registered TRANSFORMING IDEAS INTO ASSETS for IP legal services, Reg. 4,301,077, made of record at A53006, ¶13; Registration shown at (A53013-16).
[26] (A16003; A26009-11)Appellant makes reference to his personal referral network, as if Opposer, in this field for 50 years has none. It is the ***nature*** of the channel of trade that is identical, even if their networks are not the same.
[27] 37 C.F.R. § 2.106(b)(2)(ii).

that he did not know of Appellee's marks is, frankly, incredible. Appellant ignores that by law he is on constructive notice of Appellee's rights.[28]

Appellant's "evidence" of use or descriptive use of similar phrases or marks by others is by links to websites, many of which are dead ends, not found, not trademark use, or merely fossil listings. His "evidence" is not accompanied by any probative, authenticated, admissible, non-hearsay corroborating evidence. A website does not *per se* establish use. Internet listings of words or phrases do not constitute marketing channel overlap and at best are probative only for what they show on their face, not as proof of the matters he argues are asserted therein.

In essence, Appellant asks this Court to radically change the law – to declare anything on the Internet has a conclusive degree of probity, regardless of a lack of foundation, being hearsay and/or irrelevant, and lacking authentication or corroboration.

Nor would individual words of a mark, arguably "descriptive" or "commonplace element[s]", entitle applicant to use the words in combination in a confusingly similar trademark manner.  In connection with unproven use by others of arguably somewhat similar slogans, the Board determined that at best they go to suggestiveness of Appellee's mark, not evidence of no likelihood of confusion. Indeed, some are clearly closer to Appellant's mark than Appellee's. The

---

[28] 15 U.S.C. § 1057; van Os Declaration, ¶10 and Exh B-1, B-2  (A38008-9; see A26012).

continuous enforcement efforts of Appellee have been substantial over the period of 2004 to date, addressing all of the alleged "uses" considered by the Board; as such its enforcement efforts weigh in favor of a finding of likelihood of confusion.

Accordingly, the sole key issue on appeal is the similarity of the marks as they function as motivation to generate initial client contact. Appellant's thinly veiled collateral attack on Appellee's marks is an improper attempt to cloud that key issue of similarity by arguing each separate word is descriptive.[29] Properly considered in their entirety, Appellant's mark **BUILDING ASSETS FROM IDEAS** slogan is a **mere inversion** of Appellee's incontestable marks, **TRANSFORMING IDEAS INTO BUSINESS ASSETS.** Both marks convey the identical commercial impression. Appellee's nationally-renown branding expert's strong testimony is uncontested factual evidence that **both** marks serve the same marketing function: **both are branding taglines that motivate the prospect to make initial contact**.[30]

---

[29] Appellant uses the term "common element", by which he means the word is descriptive. Appellant's arguments that Appellee's marks are descriptive of legal services are legally precluded and should be stricken because Appellee's registrations are incontestable. Hence, a *per curiam* affirmance is proper.

[30] Alley attempts to blunt testimony of Black, not by providing factual admissible evidence of an expert, but rather by deliberately conflating an attorney's duty to fully inform a prospective client of his services, with the degree of sophistication of the prospect. He also professes that his slogan is unimportant to his marketing, stating "**I have never been identified by or asked about my slogan "Building Assets from Ideas" in these conversations**" (with potential clients)(A43011-12, ¶17).  Why fight so hard for a useless slogan unless in fact it is a contact motivator?

Appellant does exactly what he claims the Board erred in doing: he dissects the marks while trying to make an argument against the finding of similarity. Appellant's self-serving, unqualified, personal opinion declarations proffered as evidence are suspect, as exemplified by the lack of credibility of his claim that he did not find any of Appellee's marks in his personal pre-filing search, yet all of which are found in a brief TESS search.[31]  Appellant's declarations should be given little, if any, weight. Appellant's opposed mark poses a clear likelihood of confusion with Appellee's mark. The Board's Decision should be sustained ***per curiam***.

## VII.   ARGUMENT

### A.    Standard of Review:

The Board based its likelihood of confusion Decision on the appropriate standard of review. Appellant takes no issue with that. The Board stated its determination under Section 2(d) was "based on an analysis of **all of the probative facts in evidence** that are **relevant** to the factors bearing on the issue of likelihood of confusion. ***In re E. I. du Pont de Nemours & Co.,*** 476 F.2d 1357 (CCPA 1973) (emphasis supplied). *See also **In re Majestic Distilling Co., Inc.,*** 315 F.3d 1311 (Fed. Cir. 2003)"  (A00007).  **Only** the factors for which evidence has properly been made of record should be considered "as the ***duPont*** court explains, the relevant factors '***when of record***, must be considered'", ***Cunningham v. Laser***

---

[31] Alley has a duty of candor under 37 C.F.R. § 11.18(b) and Trademark Rule 2.20. (See A52006-7; A38008; A26149).

*Golf Corp.*, 222 F.3d 943, 946 (Fed. Cir 2000), quoting *duPont*, *id*. at 567

(emphasis in original). There is no separate burden of proof hurdle for each factor

individually, *id.* at 951.

In this Appeal, the Board's findings on individual *duPont* factors are

reviewed for substantial evidence. *Hewlett-Packard Co. v. Packard Press, Inc.*,

281 F.3d 1261, 1265 (Fed. Cir. 2002). The Board's factual determinations as to a

**relevant** *duPont* factor will be upheld if they are reasonable, account for the

record as a whole, and are based on something more than a scintilla of evidence.

*See* **On-Line Careline, Inc. v. Am. Online, Inc.**, 229 F.3d 1080, 1085 (Fed. Cir.

2000).  *See also* **In re Gartside**, 203 F.3d 1305, 1312 (2000) (*quoting* **Consolidated**

**Edison Co. v. NLRB**, 305 U.S. 197, 229-30 (1938), "Substantial evidence means

such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion"). Appellee below proved a likelihood of confusion by a preponderance

of the evidence, **Cunningham**, *id.* at 951.

In any likelihood of confusion analysis, the focus is on the **two key**

**considerations: the similarities between the marks, and the similarities**

**between the services**. *See* **Federated Foods, Inc. v. Fort Howard Paper Co.,** 544

F.2d 1098 (CCPA 1976) ("The fundamental inquiry mandated by § 2(d)[32] goes to

the cumulative effect of differences in the essential characteristics of the goods and

---

[32] 15 U.S.C. § 1052(d).

differences in the marks."). The evidentiary elements of the factors recited in

*duPont* are not listed in order of merit, and in any particular case one element or

group of elements may play a dominant role, *duPont*, *id* 1361-62. As held by this

Court, "Neither we nor the board, however, need consider every *duPont* factor",

*Shen Manufacturing Co. v. Ritz Hotel Ltd.,* 393 F.3d1238, 73 USPQ2d 1350,

1353 (Fed. Cir. 2004). A single *duPont* factor may be dispositive in certain cases,

though typically the "key considerations" are the similarities between the marks

and goods or services recited in the parties' registrations and applications. *Mattel*

*Inc. v. Funline Merchandise Co.,* 81 USPQ2d 1372, 1374 (TTAB 2006).

Here the Board found the services are identical (A72007-8); neither party

contests that finding. This **key** factor – **identity of services** – weighs strongly in favor

of likelihood of confusion. Where the services are identical, the degree of similarity

necessary to find likelihood of confusion need not be as great as where there is a

recognizable disparity between the services, *Coach Servs., Inc. v. Triumph Learning*

*LLC,* 668 F.3d 1356 (Fed. Cir. 2012); accord *Mattel Inc.*, *id.* at 1374.[33]

---

[33] In a failed attempt to distinguish services, Alley argued there are different channels of trade based on "different personal referral networks" (A59041-42). But "[t]he authority is legion that the question of registrability of an applicant's mark must be decided on the basis of the **identification** of goods set forth in the application *regardless* of . . .the particular channels of trade or the class of purchasers to which the goods are directed." *Octocom Sys., Inc. v. Houston Computer Servs., Inc.* 918 F.2d 937, 942 (Fed. Cir. 1990) (emphasis supplied). ***Notably, Alley failed to provide any evidence of his own "personal referral network", much less define it.***

**B.    The Board Properly Considered the Marks in their Entirety – It is Appellant Who Improperly Dissects the Marks.**

The Board was rigorous in its analysis, citing the same governing law that Appellant invokes here (A00020-21). The Board found that "the marks are similar **in their entireties** in terms of appearance, sound, meaning and commercial impression" (A00022). In its analysis, the Board determined that the marks "are similar because they share the words "Assets" and "Ideas" **in taglines that mean the same thing**. Trademark law does not require exact similitude to conclude that two marks are similar. *Hercules Inc. v. Nat'l Starch and Chem. Corp.,* 223 USPQ 1244, 1246 (TTAB 1984). Thus, the differences between the marks at issue do not obviate their similarity."(emphasis supplied.)

Appellee here focuses on the 2 principal arguments in Appellant's Brief. **First,** Appellant argues the Board erred on the 1st *duPont* factor, comparison of the two marks. **Second**, Appellant argues extensively that the Board erred on the 8th factor, enough time for opportunity for confusion to occur, by not considering the entire record; he attempts a re-weighing but fails to show there was no substantial evidence for the Board's findings.

In the spirit of throwing in the kitchen sink, Appellant mentions in passing that the Board did not weigh fully the 3rd (trade channels), 4th (extreme care exercised by consumers), 6th ("closer marks" in the same field of service), 9th ("single service useage"; a niche single office), 10th (market interface) and 12th

(potential for conflict) factors. Appellant says the Board was correct in its findings on the 4th and 6th *duPont* factors. Appellant does not focus on factors 2, 5, 7, 11 and 13, although he asks the Court to consider his "evidence" on the 8th factor "under the catchall 13th DuPont factor".

**Here, as to Key Factor 1, comparison of the marks**, Alley asks this Court to analyze every term in his slogan mark against every term in the Appellee's incontestable marks. In so doing, Alley engages in a detailed, semantic nit-picking dissection of the marks, thereby engaging in exactly what this Court found was error in the *Jack Wolfskin* case, yet on which he relies to show dissection is contrary to law! *Jack Wolfskin Ausrustung fur Draussen GMBH & Co., KGAA v. New Milennium Sports, S.L.U.*, 14-1789 slip op. (Fed. Cir. Aug. 19, 2015).

Contrary to Appellant's argument, the Board's discussion of the terms "Ideas" and "Assets" in its Opinion is not dissection, but rather is appropriate attention to the overall meaning and commercial impression of the two marks, while simply pointing out the undisputable fact that Appellant's slogan uses the identical words used in the incontestable registered marks of Appellee. The Board's focus and analysis is supported by substantial evidence, see the Declarations of branding expert Black, cited herein (A38022-27 and A53019-25, and supported by Parks at A38011-14, and van Os at A38001-10).

Appellant focuses on **word order** of "Ideas" and "Assets", beating a one-note semantic drum during his dissection, arguing that the word order in his slogan is inverted. Then, from mere word-order inversion, he argues there can be no likelihood of confusion. Yet on this issue, the Board had very substantial evidence of the branding-expert Black's detailed **factual testimony** to weigh against Appellant's self-serving **arguments**. Black testified on rebuttal (A53019-25, 21 ¶5)(emphasis added):

> " . . . Rather, the Alley Declaration is focused on very narrow interpretations of individual words, relying primarily on detailed semantics for its defensibility, rather than the overall impression conveyed by the marks as a whole. The Alley Declaration arguments seek to establish that the rules of vocabulary and grammar govern the understanding and impression of the marks. In my real-world experience, I have found that rules of vocabulary and grammar do not govern the impression given by the marks. **In my opinion the commercial impression created by the two marks is essentially the same: they convey the same abstract concepts via metaphor: the conversion of ideas into assets (regardless of word sequence as explained in my earlier Declaration of Nov. 22[A38023-28].** Alley's unsupported suppositions and naked arguments that comprise his Declaration overly rely on simplistic word-by-word distinctions in an attempt to establish that his word mark is memorably different from the ILG mark, even though they both relate to the same concept. In my practice I have found that concepts described in word marks are necessarily condensed in the minds of consumers to be effectively memorable. Thus, **contrary to the Alley Declaration, in my opinion based on all my years of experience in precisely this field, nuances of sentence structure are not key to their understanding, impression or market effectiveness."**

Nationally renown branding expert Black testified in her first Declaration that there is no significant difference in the **sense of the message** by word order inversion, (A38023-28, ¶7, p 24)(emphasis supplied):

> "7.  In analyzing the two marks, I note first that the dominant words are the same: "IDEAS" and "ASSETS." These dominant words are linked in phrasing conveying the meaning that one devolves from or into the other. That is done by a present participle of an action verb. **Although the order of the dominant words is inverted in the Applicant's mark, the prepositions are converse, "FROM" being the inverse of "INTO," such that the meaning is the same.** That is, inverting the order requires using the converse prepositions in order for the tagline to convey the necessary meaning. This usage does not constitute a significant difference in the sense of the message, in my opinion."

After Appellant provided his personal declaration that engaged in an extensive *Jack Wolfskin*-type dissection, Black testified in rebuttal as follows, (A53019-25, ¶¶ 6, 7, 8, 10, 11, p 22-24)(emphasis supplied):

> "6.  The Alley Declaration makes some assertions that are obviously off-point or not true.  For instance, he asserts in Paragraph 22 that the "US public has been significantly exposed to '[change]ing ideas into assets' to describe legal services in intellectual property."  I don't see any marketing or branding-related evidence to support such a sweeping opinion.  My marketing and branding  experience tells me that it is more likely that the majority of the American public, "unsophisticated" as he points them out to be, has little or no understanding of intellectual property issues, much less the nuances of phrases describing IP legal services. **The unsupported and sweeping generalizations in the Alley Declaration, which are on their face unprovable and self-serving, are unreliable opinions on which no marketing/branding professional would rely.** Additionally, the semantic review in Paragraph 24 of the Alley Declaration features a level of analytical minutiae to which no average reader of a word mark would resort in order to gain a useful understanding of the

services that the mark conveys.  **In my brand creation experience** of creating, designing and executing trade marks for my clients' use to attract customers and clients, **people don't focus on detailed semantics in word marks – they focus on general concept impressions conveyed by the marks.**

7.      In my view, the legal services consumer would not be focused on the two word mark slogans at the semantic level that the Alley Declaration asserts is relevant.  In short**, the Alley Declaration arguments are merely semantic nit-picking, rather than a consideration of the overall commercial impression, which is conceptual in nature as to what services are being offered and metaphorical as to a process being involved in the services offered. Word marks are primarily about impressions created, and here the impressions of the respective marks are essentially identical.**

8.      As my analysis in my Declaration of November 22, 2013 detailed, **the metaphor portrayed by the Alley word mark slogan is essentially identical, and confusingly similar to the metaphor of the word mark slogan of ILG**. My analysis in my earlier Declaration remains sound: Both of the marks at issue are word marks as distinct from logos or composite marks (logos + words), and both function as branding "taglines," telling the prospective client the strategic goals the respective firms offer, with respect to providing the legal services. Taglines, also known as slogans, function to provide prospects with a condensation of the essence of the service or product offered, so they can quickly "get" what the firm can do for them.  **Such taglines are intended, in connection with services, to motivate the prospect to make initial contact.  Such contact motivation is a key goal of professional services brand development taglines."**

. . . .

"10.      Then the Alley Declaration states "In Applicant's Mark, 'Building' is fanciful in that ideas cannot be physically put together, and an asset requires some metamorphosis from an idea's intangible nature, like a legal transformation, not a mere assemblage of the same, to be created."  In essence, **the Alley Declaration recognizes the metaphorical nature of the two slogans when it says "ideas cannot**

be physically put together".  A synonym for a "metamorphosis" is
a transformation.  And **Alley recognizes that "a legal
transformation" is involved in the impression given by his slogan
mark.  In essence, he necessarily agrees with ILG that the overall
impressions of the two marks are identical.**  Further, this rebuts his
"assembling" argument discussed above in paragraph 9.  Finally,
Alley is taking the position that both slogan marks are "fanciful".  For
all the above reasons, **Alley's declaration actually supports my
conclusion that the overall commercial impression of the
respective marks is the same, regardless of their specific wording.**

11.     Accordingly, **I conclude that the Alley Declaration does not
establish Applicant's mark is other than a mere inconsequential
variation of the Registered mark, metaphorically conveying the
same meaning and functioning in the same way as a contact
incentive, with the only differences being details of syntax.**  In my
opinion, speaking as they do to the same class of trade and offering
identical services via the Internet, there is a likelihood of confusion
between the parties' marks."

Appellant provided no expert rebuttal testimony evidence.

Appellant's arguments based on his subjective beliefs and speculation are

properly excluded. *Corporation Habanos, S.A.*, 102 USPQ2d 1085 (TTAB Feb

16, 2012)("testimony that is based upon 'subjective belief' or 'unsupported

speculation' is excluded.").

The inverted word order argument by Appellant is not only factually

erroneous (see Black Declarations A38023-28 and A53019-25), but also legally

erroneous, as it is contrary to scores of cases. See, for example, *Bank of America*

*National Trust and Savings Association v. the American National Bank of St.*

*Joseph*, 201 USPQ 842, 1978 WL 21292 (TTAB 1978)(The [reversed elements]

marks "convey the same meaning and create substantially similar commercial impressions." Board lists a number of prior decisions involving reversed elements.); ***Royal Crown Cola Co. v. Bakers Franchise Corporation***, 150 USPQ 698, 1966 WL 7286 (TTAB 1966), aff'd, 404 F.2d 985 (CCPA 1969) ("[A]pplicant's mark is but a transposition of opposer's mark"). In her first Declaration Black testified (A38024, ¶8) "Significantly, Applicant [Appellant here] did not use 'CONSTRUCTING', but rather used a transformational word, 'BUILDING'." Further, "Building Assets" is close in sound and meaning to "Business Assets" to a consumer.

Finally, Appellant stresses the use of the first term of his slogan, "Building", as being different from "Transforming" in Appellee's mark, which he calls "magical".[34] This is another instance of impermissible dissection, see ***Jack Wolfskin***, supra. As Black notes in her expert rebuttal testimony, "both slogans are metaphors, and 'Building' conveys a **process**, just as does 'Transforming'" (A53023, § 9)(emphasis supplied):

> "9.   With respect to an alleged conceptual difference between "Building" and "Transforming", the Alley Declaration does not support his argument.  At Paragraph 26 Alley says "'Building' gives an impression of physically constructing or assembling a large whole from individual pieces whose nature does not change, like 'building wooden logs into a cabin'." Again, that is overly narrow, as **both slogans are metaphors and "Building" conveys a process, just as**

---

[34] Clearly, if Appellee's term "TRANSFORMING" is magical, then Appellant's mark is **necessarily less** distinctive.

**does "Transforming".**  In addition, the physical act of building does in fact involve a change in "nature", such as: mortar, gravel, sand and water being changed into concrete for foundations, walls, entire buildings, floors, counter tops, tiles, walk ways, driveways, etc.; or a tree changed into various shapes, sizes and types of lumber, which then are changed into three dimensional structures; or architectural plans or interior designs changed into the physical structure or dramatically different finishes and furnishings.  **Building is transformative**, as is recognized in "The Property Brothers" HGTV show, whose slogan is "We Show You Inspiration and Transformation". "

As Appellant himself states in his Declaration (emphasis supplied): "In Applicant's [Alley's] mark, 'Building is fanciful[35] in that ideas cannot be physically put together[36], and **an asset requires some metamorphosis from an idea's intangible nature**, **like a legal transformation**, not a mere assemblage of the same, to be created" (A43034, ¶25; refiled A61034). Essentially, Appellant admits the two slogans convey the same commercial impression, considering the

---

[35] Asserting "BUILDING" is fanciful is inconsistent with Appellant's many pages of arguments and hundreds of pages of purported Internet evidence allegedly showing that Appellee's mark  is nothing more than descriptive of the services (A59016-25), yet Appellant's mark is necessarily less distinctive as it does not use a magic word. Appellant is judicially estopped from taking a position inconsistent with his lead argument, see ***Rissetto v. Plumbers and Steamfitters Local 343***, 94 F.3d 597, 600, 605 (9th Cir. 1996) on the doctrine of preclusion of inconsistent positions. Appellant's position is wholly inconsistent with the fact of his application for registration, ***Squirtco v. Tomy Corp.***, 697 F.2d 1038 (Fed. Cir. 1983).
[36] A cognitive neuroscientist would disagree on an electrochemical brain function level; this is mere self-serving, attorney argument posturing as fact.

marks as a whole, as the Board held.[37] That "testimony" of Alley is substantial evidence supporting the Board's finding that there is a likelihood of confusion.

Finally, Appellant relies on **unauthenticated, hearsay** webpage "sources" offered without foundation, as showing what he alleges is common use of individual terms. But even if various combinations of the words in Appellee's marks, or analogous words, have been used as "common elements" by others, such use "does not entitle applicant to use the words in a confusingly similar *trademark manner*." See *Specialty Brands, Inc. v. Coffee Bean Distributors, Inc.*, 748 F.2d 669, 675-76 (Fed. Cir. 1984)("Descriptive use of the word 'spice' does not entitle applicant to sue the word in a confusingly similar trademark manner.")(emphasis supplied).

Appellant's dissection analysis is irrelevant, because the marks are to be considered in their entireties. *Massey Junior College, Inc. v. Fashion Institute of Technology*, 492 F.2d 1399, 1402 CCPA 1974). Dissecting the marks side-by-side and analyzing their nuanced linguistic differences in excruciating detail, as Appellant does, ignores the function of a **slogan** mark as pointed out in the two Black Declarations (A38022-27 and A53019-25). Side-by-side mark component

---

[37] Also submitted as Opposition evidence was Alley's initial website home page design, which used an assemblage of gears, just as had Appellee's flash page. Compare A38066, Exh 20-1 (Alley's gears) with A38067. Exh 20-2 (Appellee's flash page with rotating gears labeled Ideas and Assets). Only **after** the Opposition started did Alley concoct his "Building" argument, and so changed his home page to show a "blocks" image; indicia of bad faith.

dissection is not what consumers do, nor is it how likelihood of confusion is analyzed. TMEP § 1207.01(b), *citing **Recot, Inc. v. M.C. Becton***, 214 F.3d 1322, 1329 (Fed. Cir. 2000).

### C.    Appellant Conflates Consumer Sophistication with the Function of the Marks – Likelihood of Initial Interest Confusion

Precedent requires that the likelihood of confusion decision be based "on the least sophisticated potential purchasers" ***Stone Lion Capital Partners, L.P. v. Lion Capital LLP***, 746 F.3d 1317, 1325 (Fed. Cir. 2014) ("Although the services recited in the application also encompass sophisticated investors, Board precedent requires the decision to be based 'on the least sophisticated potential purchasers.'"), *quoting **Gen. Mills, Inc. v. Fage Dairy Proc. Indus. S.A.***, 100 USPQ2d 1584, 1600 (TTAB 2011), *judgment set aside on other grounds,* 2014 WL 343267 (TTAB Jan 22, 2014). See also, ***Ford Motor Co. v. Summit Motor Prods., Inc.***, 930 F.2d 277, 293 (3d Cir. 1991)(stating, in the context of a trademark infringement case, that "when a buyer class is mixed, the standard of care to be exercised by the reasonably prudent purchaser will be equal to that of the ***least sophisticated consumer in the class***.")(emphasis added).

The Board's finding "that purchasers selecting intellectual property counsel would exercise a high degree of care" (A00014) overweighs, to Appellee's detriment, the final, Bar-mandated **informational step** of the service-sales process. **A more proper weighting accounts for the function of the marks at issue, the**

**contact motivation nature of the marks which play a key role in Initial Interest Confusion.** Applicant sold the Board on the view that the full client-intake process will **ultimately** inform the prospective client of the attorney's true identity by the time a sale is consummated, that is, by the time the attorney is retained.[38] Appellant still argues here that there will be no likelihood of confusion based on the intake process requiring a 2nd step of fully informing the client.

But Applicant's repeated ultimate intake-process argument, in its many variations, completely misses the point of the nature of the marks and how they function. By the time a consumer has engaged with Appellant as a result of his confusingly similar slogan, it is too late for Appellee. The damage has already been done, Appellant has improperly obtained a coveted interview, a clear advantage over Appellee, to its damage.

This is classified as Initial Interest Confusion which Appellee has the right to prevent. See *HRL Associates Inc. v. Weiss Associates Inc.*, 12 USPQ2d 1819, 1989 WL 274391 (TTAB 1989), *aff'd on other grounds,* 902 F.2d 1546 (Fed. Cir. 1990)(Initial Interest Confusion is actionable under Lanham Act §2(d) in PTO *inter partes* proceedings.) McCarthy is on-point in explaining initial interest confusion and why it is actionable in cases such as this Opposition, even where there may be an extended purchasing process by sophisticated consumers: *4*

---

[38] A59014, 15, 33-35.

*McCarthy on Trademarks and Unfair Competition* § 23:6 (4th Ed.); *Television Enterprise Network, Inc. v. Entertainment Network, Inc.*, 630 F. Supp. 244 (D NJ 1986); *Koppers Co. v. Krupp-Koppers GmbH*, 517 F. Supp. 836 (W.D. PA 1981); *Blaw-Knox Co. v. Siegerist*, 300 F. Supp. 507 (E.D. MO 1968), *aff'd and modif'd in part* 414 F.2d 375 (8th Cir. 1969).

Initial Interest Confusion analysis is applied to a purchasing process that is drawn out over a period of time, *HRL*, *id*; *McNeil-PPC v. Guardian Drug Co.*, 984 F. Supp. 1066 (E.D. Mich. 1997)( "Defendant has already accomplished what it set out to do, which is to confuse the consumer at the point when he first reaches for the product on the shelf. It is at that point that the damage is done.")  Here the attorney, Appellant, has induced the potential client to contact him so Appellant can obtain a coveted (and absolutely necessary) interview. It is at that early point Appellant has done damage to Appellee. See *4 McCarthy*, id.

Appellant's primary argument, that prospective legal services consumers will **eventually** figure out who he is, is no defense to likelihood of Initial Interest Confusion. This is true whether the Board determined Appellee's marks are weak or strong, see *King Candy Co. v. Eunice King's Kitchen, Inc.*, 496 F.2d 140 (CCPA 1974).  Appellant merely *argues* for *possible* subsequent cure through an interview process, **but the law is clear**: whatever the degree of subsequent cure there arguably might be, **later cure is no defense to Initial Interest Confusion**.

The bottom line for the entire issue over sophistication of purchasers and the extensive Bar-required client-informing step, is that likelihood of confusion exists whether confusion is later cured, a point not addressed by Appellant in his briefing before the Board or this Court, and which was not accorded due weight by the Board.[39] Thus, for example, the Board did not even mention the testimony of Parks, Treasurer and principal of TP Solar, Inc. of Paramount, CA a solar cell equipment manufacturer. Parks testified (A38013, ¶5)(emphasis supplied):

> "5.   On checking out ILG's website**, I was immediately struck by the ILG slogan "Transforming Ideas Into Business Assets"**. I found the slogan to be creative, attention-getting, and insightfully outside the box. When hiring a lawyer I believe it is important that the lawyer knows more than just "the law" but also that the lawyer knows how to apply the law toward client goals. While some applications of the law are "standard" other situations require the lawyer/advocate to be creative and to consider the facts and issues from a number of different angles. ILG's slogan immediately conveyed to me that the firm thinks creatively and strategically. I believe these characteristics exhibit cost effective, goal oriented lawyering, characteristics of the type of law firm that we were looking for as being best for my company's needs**. The slogan was a powerful and primary motivation for me to call Mr. Dulin regarding the services of ILG, and how a long distance relationship would work out. Accordingly I promptly called and interviewed him by phone."**

---

[39] See also ***Famous Horse Inc. v. 5th Ave. Photo Inc.***, 624 F.3d 106, 108 (2d Cir. 2010).

Parks continues in his Declaration ¶6, id., describing the **subsequent**

informational interview, upon which ILG (Appellee) was engaged by TPSI.[40]

Further, van Os testified (A38005)(emphasis supplied):

"7.   Because of my experience working in intellectual property law, I am aware that it is difficult to describe succinctly what intellectual property lawyers do, in an all encompassing and **distinctive way**. Based on my experience as an intellectual property professional and my experience working for Innovation Law Group, the service mark "Transforming Ideas Into Business Assets" is **so highly distinctive as to motivate a prospective client to investigate further** into the nature and quality of Mr. Dulin's services.  In my experience with ILG and since, **the "Ideas – Assets" linkage in the ILG tagline was a key to that prospect contact motivation, as it spoke to ILG's strategic understanding of the role of IP for their needs."**

Neither Park's or van Os's testimony on this factor was contested by Appellant. It

was not commented-on by the Board. Their Testimony is solid evidence of the

initial interest nature and function of Appellee's marks. Appellant presented no

evidence whatsoever on this vital factor.

### D.   There Was Substantial Evidence for the Board to Find Insufficient Opportunity for Confusion to Occur.

Appellant argues (his Brief, pp 25-30) that the Board seized on "geographic

dissimilarity" to give neutral weight to the 8th *duPont* factor, evidence for or

against opportunity for actual confusion to have occurred.  He claims the Board

---

[40] Importantly, the reference by Mr. Parks to a "long distance relationship" is strongly indicative of the potential for future actual confusion.  TP Solar Inc was then and still is located in Paramount CA; it is of public record that ILG has represented TP Solar in the USPTO, the EPO, Taiwan and China, and in patent infringement litigation in D. MN and in the C.D. CA.

(seemingly wrongly *per* his argument) "in fact found that both Applicant and

Opposer advertised their marks nationally on the Internet" (id., p 27).  The Board

noted a lack of Appellant's evidence on this factor (A00023)(cite omitted):

> "Although Applicant is licensed to practice law in California and
> Virginia, he has advertised on the Internet which is national in scope.
> There is no other testimony or evidence regarding Applicant's
> advertising or geographic trading area."

Thus, the Board was commenting on Appellant's lack of evidence about details of

his practice area, his alleged contacts network and his advertising on other than

the Internet. Alley points to no evidence that he adduced during the Opposition

that goes to those aspects of opportunity for confusion to have occurred, on which

it was his burden to move forward. The Board simply can't weight what is not

there; hence the soundness of its ruling that "we cannot make a finding whether

after two and one-half years of simultaneous use, there has been a reasonable

opportunity of confusion to have occurred." Board Opinion, (A00023, 24).

As noted in Appellee's Statement of Facts above, in fact the Alley mark was

invisible for almost two years, until well into this Opposition, embedded by him in

his home page gears-image box. Thus, the Board was over-generous to Appellant

in according 2 ½ years of simultaneous use of both marks "on the Internet which is

national in scope." Appellee's position is that only **after** Appellant made his slogan

Internet searchable, claimed to be March 2013, was there **any** opportunity for

Internet-based confusion to have begun; that was after Opposition was instituted.

Further, the number of "unique visitors" in the same time period is hearsay and not authenticated. That period includes invisibility, when such visitors could neither search via his slogan mark, nor see it in search results. Further, he does not distinguish between trade name and trademark searches, or searches broadly for "IP attorneys", "patent attorneys" or any other search string. The Alley slogan mark during invisibility could not be indexed "in the Google search engine". Appellant admits any "indexing" by Google was only an unstated time of "over a year". Nor is he clear about what was "indexed". That period is not the 2 ½ years the Board accorded Appellant. The weight on this 8th factor favors Appellee.

Appellant then claims a listing under his trade name on the Internet is "advertising prominently displaying Applicant's mark" even though he testifies that the mark served no marketing purpose ever.[41]  Appellant also claims such trade name "advertising" was "widely and nationally **consumed** through visits and search engines for over three years **alongside** Opposer's marks, with neither consumer nor search engine confusion."  Besides being mere self-serving opinion, without foundation or corroboration and **obvious hearsay**, now, one year has been inflated into three years, even though invisible for almost two. Appellant has not a scintilla of evidence that his "advertising" was "**consumed**", whatever that

---

[41] "**I have never been identified by or asked about my slogan**" (A43011-12, ¶17).

means, by anyone, much less a search engine. Nor does he show how a search engine could be confused or how the marks were "alongside" each other.

The overlap suggested by the mere existence of the Internet has been inconsistently argued by Appellant. He argues the Internet is significant overlap for the purpose of factor 8, concurrent use without actual confusion.  But then Appellant ignores the Internet as an element of factor 10: providing market interface between Appellant and Appellee. Appellant cannot have it both ways. The Board balanced these factors well, pointing out lack of evidence on factor 8, and invisibility cannot weigh for Appellant. Yet, the common potential trade channel weighs factors 3 and 10 in favor of Appellee. ***Entrepreneur Media, Inc. v. Smith***, 279 F,3d 1135, 1151 (9th Cir. 2002) (" [t]he vast majority of companies today utilize some form of an Internet site and, therefore, this factor alone cannot be determinative.")

Finally, Appellant argues there is a "voluminous record" of alleged third party uses, citing Internet sources. That questionable "evidence" has been fully analyzed in the supplemental Statement of Facts above, pp 18-27. Appellant's then 67-"sources" list of 135 web pages (Alley's Exhibits A1 – PPP1) was analyzed by Appellee for the Board (A46002-67, see chart at pgs 14-62), of which the Board was fully cognizant and reviewed in detail (A00004).  In turn, the Board distilled them down to 17 listings, all of which Appellee has addressed in its policing

efforts, see supplemental Statement of Facts above, pp 18-27. Appellee showed

Appellant's list items: were not disclosed to Appellee as required during discovery;

lack foundation and corroboration; are irrelevant (under the 6th factor, for

example); constitute hearsay; are filled with duplications; include obvious non-

trademark use, such as books and articles using phrases not in connection with IP

legal services, and irrelevant foreign listings; include web archive dead-ends, pages

not found, and pages having no such phrases as he claims were used.

The probative value of Internet documents is limited and "may not be used

to demonstrate the truth of what has been printed" in them, TBMP 704.08(b).

Appellant provided the Board with no extrinsic evidence of the extent to which a

particular website has been viewed. Accordingly, the Board could not conclude

that there has been an impact (or not) on the marketplace that Appellant asserts.

Contrary to Appellant's position with respect to such 3rd party websites,

pursuant to TTAB evidentiary rules, a website does not *per se* establish use. ***Safer***

***Inc. v. OMS Investments, Inc.***, 94 USPQ2d 1031 (TTAB 2010, precedential), n.

13 ("Documents submitted under notice of reliance pursuant to Trademark Rule

2.122(e) are generally admissible and probative only for what they show on their

face and not as proof of the matters asserted therein. ***Boyds Collection Ltd. v.***

***Herrington & Co.***, 65 USPQ2d at 2020 n.8; ***Exxon Corp. v. Fill-R-Up Systems,***

*Inc.*, 182 USPQ 443, 445 (TTAB 1974); TBMP ¶708 (2nd Rev. 2004) and the cases

cited therein.") At best they may go to the suggestiveness of the marks.

The precedential case, ***Top Tobacco, L.P.***, 101USPQ2d 1163, 2011 WL

6099691 (TTAB Nov 21, 2011) is directly on-point (at *8-9):

> "North Atlantic argues in its brief that there is extensive use by third
> parties of marks containing the term CLASSIC, for tobacco related
> products, . . . As to the evidence of actual use of the term CLASSIC in
> third-party marks on tobacco products, this is not accompanied by any
> other evidence indicating the length of time said marks have been in
> use, the degree of exposure, or the popularity of such marks vis-à-vis
> the relevant purchasing public. Accordingly, this factor remains
> neutral in our analysis."

Indeed, in ***Top Tobacco***, the third party marks included **registrations**, whereas

here no third-party registrations are cited by Appellant. Every single attempt to

register a confusing mark has been confronted by Appellee and defeated (A63002-

55; A38036-149; A53002-18; TESS search record, A38008).

In short, the Board fully considered all the Appellant's cites, and there is no

reversible error in the weight, or lack of weight, given them in evaluating an

alleged 3rd party "use" ***duPont*** factor. All Appellant argues is that the analysis

and weighing of the Board, which argument he terms "deferential [in] nature", did

not come out as he wanted. He erroneously claims "the panel ignored **alternative**

evidence under the eighth ***duPont*** factor"[42] re-arguing for the third time his

alleged third party use. He claims "there is no way to tell if the panel even

---

[42] Appellant's Brief, p 28.

realized any of these arguments had been made or if the evidence existed, let alone if any of it was given fair consideration".[43] Let's see: Appellant provided all those cites to the Board, argued them at the Hearing before the panel, and detailed analysis of them appears on pages 13 – 17 of the Board's Opinion (A00013-17), taking more than 20% of it. Appellant has nothing to complain about, and has pointed to no evidence on the 8th *duPont* factor that contradicts the Board's Decision. The Board cannot weigh in his favor, a factor without convincing evidence for it, which he failed to produce.

### E.    Appellant's Purported Good Faith is Legally Insignificant

Appellant claims he adopted his slogan mark without prior knowledge of Appellee's mark, **in spite of a trademark search having been done personally by him**. Appellee has shown that claim is incredible. Regardless, the Court need not go there, as a claim of good faith adoption of a mark will not prevent a finding of likelihood of confusion. *Mag Instrument Inc. v. Brinkmann Corp.*, 96 USPQ2d 1701, 1713 (TTAB 2010), *aff'd. mem.* 2011-1052, 2011 WL 5400095 (Fed. Cir. Nov 9, 2011).

---

[43] Appellant's Brief, p 32.

**F.    Any Doubts Should be Resolved in Favor of Appellee, the Prior User**

Although Appellee strongly believes the merits of this case point strongly in its favor, should the Court have any remaining doubt as to the weight accorded the factors by the Board, any such doubt should be resolved against the newcomer, Appellant/Alley.  "It is well settled that one who adopts a mark similar to another [here, in meaning and initial interest function] for closely related goods [here, identical services] acts at his peril and any doubt there might be must be resolved against him." *Carslile Chem. Works, Inc. v. Hardman & Holden Ltd.*, 434 F.2d 1403, 1405 (CCPA 1970). See also, *A.T. Cross Company v. Jonathan Bradley Pens, Inc.*, 470 F.2d 689, 692 (2d Cir. 1972)(Friendly, J)("It should be known by this time that this Court does not look with much favor on the businessman who, out of the wealth of words available, chooses as a trademark one which comes as close as he dares to a well-known mark on the identical product").

## VIII.  CONCLUSION

The Board's non-precedential Decision, as expressed in its Opinion, is clearly based on substantial evidence. The Court should decline Appellants invitation to rule that everything on the Internet has per se a conclusive degree of probity, regardless of a lack of foundation, being hearsay and/or irrelevant, and lacking authentication or corroboration. The Board's Decision should be Affirmed, *per curiam*.

Appellant testified that his slogan mark serves no marketing purpose. Hence, he can simply pick another slogan, rather than encroach on incontestable marks that serve, for Appellee, an active and significant contact-motivating function. Considered in their entirety, the marks have the same meaning to the consumer of the services, and there is a clear likelihood of initial interest confusion. That it might be clarified later by Bar-mandated disclosures is irrelevant. The law is that initial interest confusion is real, results in likelihood of diversion of a coveted interview, and conveys an improper advantage to Appellant in derogation of Appellee's incontestable rights. The refusal to register Appellant's mark deserves deference for its detailed review of the evidence, and should be Affirmed.

Respectfully Submitted,

/s/ Jacques M. Dulin
Jacques M. Dulin, Esq,
Innovation Law Group, Ltd.
237 N. Sequim Ave.
Sequim, WA 98382
(360) 681-7305 (Telephone)
(360) 681-7315 (Facsimile)
dulin@innovationlaw.com

*Counsel for Appellee*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that, on this the 16th day of December 2015, I electronically filed the foregoing Brief of Appellee with the Clerk of Court using the CM/ECF System, which will send notice of such filing to all registered users.

I further certify that, upon acceptance and request from the Court, the required paper copies of the foregoing will be deposited with United Parcel Service for delivery to the Clerk, UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT, 717 Madison Place, N.W., Washington, D.C. 20439.

The necessary filing and service were performed in accordance with the instructions given to me by counsel in this case.

/s/ Melissa A. Dockery
Melissa A. Dockery
GIBSON MOORE APPELLATE SERVICES
P.O. Box 1460
Richmond, VA  23218

**CERTIFICATE OF COMPLIANCE**
**With Type-Volume Limitation, Typeface Requirements,**
**and Type Style Requirements**

1.    This brief complies with the type-volume limitation of Fed. R. App. P.
      32(a)(7)(B) because:

          this brief contains <u>13,602</u> words, excluding the parts of the brief
          exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P.
      32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

          this brief has been prepared in a proportionally spaced typeface using
          <u>Microsoft Word</u> in <u>14 Times New Roman</u>.

Dated: December 16, 2015                    <u>/s/ Jacques M. Dulin          </u>
                                            Jacques M. Dulin